**COLLINS et al. v. HUPP MOTOR CAR COR-PORATION.**

Circuit Court of Appeals, Sixth Circuit.
October 19, 1927.

Nos. 4793, 4799.

1. **Patents ⟳328—Pearson, 855,970, claims 1, 2, 3, for side curtain supports, held valid and infringed.**

Pearson patent, No. 855,970, claims 1, 2, 3, for side curtain supports for vehicles, *held* valid and infringed.

2. **Patents ⟳62(3)—Proof of unpatented device claimed to be anticipation must be clear, satisfactory, and beyond reasonable doubt.**

As respects an unpatented device claimed to be a complete anticipation of patent in suit, depending as to its existence and use on oral testimony, proof must be clear, satisfactory, and beyond reasonable doubt.

3. **Patents ⟳290(1)—Exclusive licensee may make owner coplaintiff without his consent, in suit to enjoin infringement.**

In suit for infringement of patent by person given exclusive license by owner to manufacture, sell, use, or grant to others such right, plaintiff had right, on owner's refusal to join in such suit to protect their joint rights, to make owner party plaintiff without his consent.

4. **Patents ⟳319(1)—Licensee and owner held jointly entitled to recover full damages from date of infringement to expiration of patent (35 USCA §§ 67, 70).**

Exclusive licensee and owner of patent *held* jointly entitled to recover full damages sustained from commencement of infringement until expiration of patent; Rev. St. §§ 4919, 4921 (35 USCA §§ 67, 70 [Comp. St. §§ 9464, 9467]), not defeating licensee's right to damages.

5. **Patents ⟳319(1)—That damages for infringement were not apportioned between licensee and owner held immaterial.**

That damages for infringement of patent were not apportioned between exclusive licensee and owner *held* immaterial, since contract between parties furnished basis therefor.

6. **Patents ⟳319(1)—Resort to reasonable royalty as damages for infringement held proper, where profit or damages were not easily determinable.**

Where amount of damages for infringement and profit resulting to defendant was not easily determinable with reasonable certainty, and no established uniform right of royalty had been adopted or used, a resort to reasonable royalty was eminently proper.

7. **Patents ⟳319(4)—Interest on royalty award is allowable from date infringement ceased until final decree.**

Interest on royalty award should be allowed from date infringement ceased until final decree.

8. **Patents ⟳319(4)—Court may award interest from time license should have been purchased as part of damage for failure to do so.**

It is within court's discretion to award interest on royalty award from time license should have been purchased as part of damages for defendant's failure to do so.

9. **Patents ⟳319(4)—Court, in awarding interest on damages for infringement, did not abuse discretion in not computing interest with periodical rests.**

Court, in computing interest on damages for infringement, *held* not to have abused discretion in not computing interest with periodical rests.

10. **Patents ⟳319(4)—Allowing interest at 5 per cent. on damages for infringement held not abuse of discretion.**

Court, in awarding interest at the rate of 5 per cent. on damages for patent infringement, *held* not to have abused discretion.

11. **Patents ⟳324(5⅝)—Concurrent action of master and district court in refusing to increase damages because of failure to prove willful infringement will not be lightly set aside.**

Concurrent action of master and district court in refusing to increase damages because of failure to sustain burden of proving that defendant had been guilty of willful infringement will not be lightly set aside.

12. **Patents ⟳319(4)—Infringer held liable on basis of reasonable royalty for article installed in unsold automobiles and those not yet installed.**

In computing damages on basis of reasonable royalty, patented article installed in unsold automobiles or not yet installed must be accounted for, since, in case defendant had taken license to manufacture, presumably it would have been required to pay for all manufactured.

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Patent infringement suit by Jeffrey N. Collins and another against the Hupp Motor Car Corporation. From the decree (4 F.[2d] 272), both parties appeal. Affirmed.

Stuart C. Barnes, of Detroit, Mich. (John F. Henigan, of Jackson, Mich., on the brief), for plaintiffs.

Fred P. Fish and J. L. Stackpole, both of Boston, Mass. (Robert A. Brannigan, of New York City, Hector M. Holmes, of Boston, Mass., and Whittemore, Hulbert, Whittemore & Belknap, of Detroit, Mich., on the brief), for defendant.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This suit was brought by Collins against the Hupp Motor Car Corporation for infringement of claims 1, 2, and 3 of United States patent No. 855,970, June 4, 1907, to Pearson, assignor to Blackmore, on side curtain supports for vehicles, with special reference to

open canopy top automobiles. Collins' right to sue is based upon an alleged exclusive license given him by Blackmore to manufacture, sell, and use, or grant to others the right to manufacture, sell, and use, the invention of the patent as applied to automobile manufacture. Blackmore was accordingly made coplaintiff. He formally ratified the suit before defendant's testimony was closed. The District Court found the patent valid and infringed, and awarded plaintiffs, by way of damages and profits, the sum found by the master on the basis of a reasonable royalty. 4 F.(2d) 272. The patent having expired pending suit, no injunction issued. Each party appeals.

Claim 2 reads as follows:

"2. The combination with a vehicle body, comprising an inclosed portion provided with a suitable entrance, a door for said entrance, a canopy for said vehicle body and curtains comprising a door section secured to a canopy or other support at one edge beyond the line of the door hinge and a support for the opposite edge of said door section consisting of a rod or standard detachably secured to said door so as to be movable therewith and removable therefrom."

Claim 1 differs from claim 2 only in omitting the detachable feature of the supporting rod and in designating the curtains as "side curtains." Claim 3 differs from claim 1 only in calling for an offsetting of the rod at its lower end to bring it in desired relative position.

[1] We agree with the District Court that the claims in suit are valid. The specification states that "the primary object of the invention is to provide side curtains for the canopies of automobiles and other vehicles [the bodies of which comprise tonneaus which are provided with an entrance or entrances and a door or doors for closing the same], said side curtains comprising sections so supported that they form, in effect, upward extensions of said doors which will open and close therewith, to provide for conveniently opening and closing the entrance to the tonneau when the side curtains are in position, thus entirely eliminating the objectionable feature above described,"[1] which plainly refers to the necessity "that the section of the said curtain covering the entrance to the tonneau be unfastened each time a person desires to enter or leave said tonneau." The specification further declares "that the invention resides primarily in the means for supporting the [intermediate section 2 of the] side curtains, whereby they may be opened with and practically as a part of the doors C which close the entrance to the tonneau."

The prominent and new element referred to is in reality a door curtain opener, which consists of an upright rod or standard removably attached to the lock edge of the door and movable with it, and to which rod or standard the curtain is removably secured. The curtain structure is thus self-contained. The curtain is not supported by or attached to any part of the automobile except its own door and the rod or standard which is a component part of the curtain structure and (at the rear edge of the curtain) to the canopy support. It appears by testimony of competent witnesses that the invention of this patent was revolutionary. The device of the patent is highly useful and meritorious. It has been adopted by practically all the automobile manufacturers in this country except Ford. In addition to its merit as a mere curtain carrier, it is adaptable to ready disassembling when curtains are not needed. That this was recognized by the patentee is evidenced by the statements in the specification not only of his preference to secure the rods or standards to the doors "so that they may be readily attached when wanted for use and detached and removed when not wanted for use," but also that the openings between the body of the vehicle and the canopy "are adapted to be closed by removable side curtains comprising front section 1, intermediate section 2, and rear sections 3"; also by the provision for buttoning or otherwise securing the rear edge of the curtain section to the canopy support to which the front edge of the rear section of the side curtain is fastened in the usual manner, and by attaching in like manner the upper edge of the curtain section to the lower member of the canopy frame in the rear of the line of the door hinge; and by similarly attaching the curtain section to the upper edge of the body and door. The specification states that, "with this construction, it is obvious that the section 2 of the side curtain, in front of the hinge of the door, will be free to swing or turn with the door, thus providing for opening and closing the entrance to the tonneau by merely opening and closing the door C."

We find nothing in the prior art destroying the novelty or patentability of the claims in suit. The patent art specially relied on consists of Wright, No. 121,922, December 12, 1871, and Gale, No. 204,807, June 11, 1878. Neither of these patents directly relates to the automobile art, which in fact came

---

[1] The brackets used in quotations are ours unless otherwise stated, as also are italics.

later. Both patents relate to carriage doors, not to door curtain openers. Wright's contribution consists in fastening a strip of wood to the upper part of the iron frame so that it can be easily adjusted in case of repairing the curtain. The stated object of the invention is to make a more substantial and neater door job, and to give the door a lasting grip to keep it from rattling. Gale discloses a recess in the upper rail extending from the front canopy post rearward, and of sufficient length to receive the top rail of the door. To our minds, neither of these patents suggests anything resembling in form or function the "rod or standard" of the door curtain opener of the patent in suit.

[2] *As to prior public use:* Defendant introduced considerable testimony of claimed prior use on certain automobile station wagons of various manufacture. So far as definitely shown, these station wagons had a permanent door structure reaching from the sill to the side rail of the top, and hinged at both the top and bottom of the rear edge of the door. We cannot accept the contention that these permanent door structures were the equivalent of the "rod or standard" of the patent in suit. We think the words "rod" and "standard" mean substantially the same thing. The station wagon curtains were not readily removable, but when not in use were rolled up, and, as such roll projected over the rear edge of the door, it was naturally subjected to a bending when the door was opened. There is persuasive testimony, from competent witnesses, that these structures were impracticable. We think it clear that they did not anticipate the Pearson invention or suggest its nature. There is also evidence of a so-called Glesenkamp use which is alleged to anticipate Pearson. Whether, if antedating, it would anticipate, we need not determine, for we think the testimony regarding dates too uncertain to support a conclusion of priority. It is a common place, that, as respects an unpatented device claimed to be a complete anticipation of a patent in suit, and depending as to its existence and use upon oral testimony, the proof must be clear, satisfactory, and beyond reasonable doubt. 20th Century Co. v. Loew (C. C. A. 6) 243 F. 373, 379, and cases there cited. Pearson's application was filed April 2, 1906. The testimony as to the date of the Glesenkamp use ranges from 1902 to 1906. The alleged dates are not supported by documentary evidence of any kind. There is produced no structure appearing to have been made prior to the granting of the patent in suit.

If there were otherwise doubt of the novelty and patentability of Pearson's device, the doubt would be removed by the evidence of its general acceptance by the trade. There is apparently undisputed evidence that 6 prominent manufacturers [2] have made their own irons under license agreement from plaintiffs, and that 38 body trimmers, trimming and top companies (perhaps 75 per cent. of the entire number) have purchased the irons from the company which made them under contract with one or the other of the plaintiffs.

The record also indicates that defendant here took from Blackmore, through Collins as agent, in 1914, a license to use certain openers under the patent in suit, as well as under another patent granted in 1911.

The fact that the Pearson device was not put upon the market for several years after the patent issued does not seriously impair the effect of general public acceptance when it was actually put out. The same observation is true as to the fact that the great majority of users bought the irons manufactured under the patent in suit, instead of manufacturing them under royalty license. The same we think is true of several other considerations urged by defendant as indicating lack of a long-felt want.

We have not discussed each and every contention made by defendant against the validity of the patent in suit, but we have considered all of them, with the result already generally stated.

We also agree with the District Court that defendant has infringed the three claims in suit. While its structure is not identical with the device of the Pearson patent, we think it embodies and employs that invention. Of course the fact, if it be such, that defendant's device (as is probably the case) is an improvement over Pearson, does not negative infringement.

Defendant contends not only that Collins has no right to maintain suit in his own name, but that he had no right to join Blackmore as plaintiff without his consent; that the latter's ratification of June 12, 1923, did not relate back to the commencement of suit, but authorized recovery of damages for merely 6 years prior to ratification; and that the damages recoverable here are only Blackmore's net damages, which, in effect, means one-half of what Blackmore would have received from defendant under the Blackmore contract with Collins, had defendant paid a royalty for the use of the patented invention, the other half going to

---

[2] Cadillac, Dodge Bros., Haynes, Packard, Locomobile, and Westcott.

Collins, to be treated, for the purposes of recovery, merely as Blackmore's expense of collection. This contention also means that no recovery can be had here for Collins' losses by the infringement.

The agreement of March 23, 1914, between Collins and the company in whose name Blackmore did business—and which company, for the purposes of this opinion, we treat as Blackmore—provided that, in return for Collins' efforts to interest, and sell the patented curtain openers to, motorcar manufacturers,[3] Blackmore would produce for Collins the complete device at a stated cost in lots of 10,000 or more, to be sold for not less than a stated price; that the profits of both parties be equally divided "from the proceeds remaining between the selling price and the cost price" so stated; that licenses from Blackmore to manufacture the devices should be obtained by Collins "on a basis of not less than 20 cents per car, which license is to be equally divided between" Blackmore and Collins; that any further profits derivable from increased prices obtained by Collins should likewise be equally divided; that, if Blackmore should be able to lessen the cost of production of the device, by either decrease in cost of production or cheapening in design or material, suggested by either party, such increased profit should be equally divided; and that "if, in the development of the business, a change in design to one of greater cost is found necessary," prices for openers, with such change incorporated, will provide for such increased cost of production to allow a profit to both parties. For the purpose of settling differences which had arisen between Collins and Blackmore as to the construction of the former agreement mentioned, on September 11, 1917, a "supplemental agreement" was made, whose important provisions are: Collins agreed that, as Blackmore's agent, he would report to the latter the names of the different manufacturers with whom he is negotiating for the use of the curtain openers; that Collins has not entered and will not enter into any agreement giving any firm or individual the exclusive right to manufacture curtain openers covered by that agreement; Blackmore agreed that the contract of March 23, 1914, created in Collins *"an exclusive agency* to' represent * * * Blackmore in all his dealings with the manufacturers of automobiles," and to pay to Collins one-half the net profits result-

ing from contracts theretofore taken by Blackmore direct, with the exception of one contract mentioned, in which Collins was to receive one-half of a 12½-cent rate set forth therein. It was mutually agreed that Collins, in all his dealings with automobile manufacturers, or with manufacturers of the curtain openers who had theretofore manufactured or used, or who should thereafter be called upon to manufacture or use, the curtain openers, should act solely as the agent for Blackmore, and that Collins had no interest in the business or patents of Blackmore *other than Collins' interests as defined by that agreement;* also that the standard price of the curtain openers manufactured under Blackmore's patents should remain as fixed in the former agreement, at not less than 25 cents per car, except as might thereafter be modified by mutual consent; that the agreement should exist from that date, "and bind both parties hereto until the expiration of the Pearson patent, which is approximately seven years from this date"; and, further, that the original contract of March 23, 1914, "shall stand except as modified by this agreement." There was also express provision for "monthly settlements, to include all moneys received by either of the parties from the sale or licensing of the curtain openers * * * on the basis of one-half of the amounts received from the sale or licensing" thereof.

[3, 4] It seems clear that Collins thus acquired, and when this suit was begun still held, an irrevocable right for the entire remaining life of the Pearson patent—exclusive as against all the world but Blackmore—to the benefit of the patent in dealing with manufacturers of automobiles, not only with respect to the manufacture and sale of the devices of the patent, but in the sale of the privilege to manufacture the patented devices; and as exclusive agent of Blackmore, the holder of the legal title to the patent (but in which Collins as respects motorcar manufacture was beneficially interested for its entire remaining life equally with Blackmore), to grant nonexclusive sublicenses to manufacturers of motorcars, and to sell the manufactured patented devices according to his own honestly exercised judgment and will, so long as he received the minimum royalty provided by the contracts before us. It did not escape being an exclusive license merely because it was for an undivided beneficial interest in the patent, and although limited to the automobile manufacturers' trade; and it must not be forgotten that, stating the case in the aspect least favorable to Collins, Collins and Blackmore together had the right to exclude

[3] The Collins and Blackmore contract applied only to the motorcar manufacturers' trade. Collins had no interest in Blackmore's other patent business.

all others from practicing the invention, and had the sole right to practice it themselves. It would be more proper to say that, by whatever name this relation may be called—whether an exclusive license, an exclusive agency, or otherwise—we think the case falls within the principles announced in Independent Wireless Co. v. Radio Corporation, 269 U. S. 459, 464, 468, 474, 46 S. Ct. 166, 70 L. Ed. 357, and cases there cited and discussed, especially Brush-Swan v. Thompson-Houston (C. C.) 48 F. 224, and Brush Electric Co. v. California Light (C. C. A.) 52 F. 945. We also think that on Blackmore's refusal to join with Collins in a suit to protect rights so jointly owned, Collins had the right (not to sue in his own name alone, he has not attempted so to do) to make Blackmore a party plaintiff with him, upon the principles announced in the Independent Wireless Case. We see no basis for the existence of such right in the ordinary case of exclusive license, which would not apply to the case presented in this equitable proceeding. We think, to say the least, that Blackmore held the title to the patent in trust for Collins as well as for himself, and upon plain principles of equity was under obligation to allow his name to be used in proceedings to redress the joint grievance. Independent Wireless Company Case, supra, 469, 472, 473 (46 S. Ct. 166); Waterman v. MacKenzie, 138 U. S. 252, 11 S. Ct. 334, 34 L. Ed. 923. We find nothing in the statutes invoked by defendant (R. S. §§ 4919 and 4921 [35 USCA §§ 67, 70; Comp. St. §§ 9464, 9467]) negativing Collins' right to damages upon the case made here. Regardless of what the scope of the accounting would be if Collins were not a proper party plaintiff, it follows, we think, from the views we have expressed, that Collins and Blackmore are jointly entitled to recover here the full damages sustained by plaintiffs from the commencement of defendant's infringement until the expiration of the patent in suit, viz. June 4, 1924.

[5] We see no force in the objection that the damages awarded have not been apportioned. The contract between the parties furnishes the basis therefor.

[6] *The accounting:* The District Court affirmed the master's report, and awarded plaintiffs, by way of damages for infringement from September 24, 1914, to June 4, 1924 (the expiration of the patent), $30,158.58, plus interest at 5 per cent. from the last-named date. The award was on the basis of a "reasonable royalty," it appearing that, while plaintiffs had been damaged by, and defendant had profited from, the infringement, the amount of neither profit nor damages could be calculated with reasonable certainty. No established uniform rate of royalty had been adopted or used. The resort to reasonable royalty was eminently proper. Dowagiac Co. v. Minnesota Co., 235 U. S. 641, 648, 35 S. Ct. 221, 59 L. Ed. 398; U. S. Frumentum Co. v. Lauhoff (C. C. A. 6) 216 F. 610; Clark v. Schieble (C. C. A. 6) 248 F. 276; K-W Ignition Co. v. Temco Co. (C. C. A. 6) 283 F. 873, 877. The reasonable royalty adopted was 6 cents per curtain rod, being 24 cents for a touring car and 12 cents for a roadster.

Aside from the criticisms already overruled, that damages should have been awarded to Blackmore only, and to him only from June 12, 1917, and at but one-half the loss to Collins and Blackmore together, defendant contends (1) that 6 cents per rod was unreasonably high; and (2) that the royalty was erroneously applied to rods made and not sold by defendant during the accounting period. Plaintiff contends (1) that the royalty of 6 cents per rod was unreasonably low; (2) that interest should have been allowed periodically (quarterly or monthly) instead of from the date of patent expiration; (3) that the rate of interest should have been 6 per cent. instead of 5 per cent.; (4) that the damages allowed by the master should have been substantially increased.

*As to the royalty rate:* The royalties paid came from three sources: (1) The Motor Products Company, which manufactured the rods for plaintiffs; (2) payments by automobile manufacturers for licenses, ranging, according to defendant's schedule, from 10 cents paid by Locomobile, 6¼ cents by Cadillac, Westcott, and Haynes, to 3⅒ cents by Studebaker, 2½ cents by Willys-Overland, and 98/100 cents by Dodge (the last three seem to have been extreme or special cases); (3) settlements by Hudson, Standard, and Franklin at 6¼ cents. The Hupp contract, made August 14, 1914, for a term of "one or more years," did not fix the royalty rate, but provided for purchase of the curtain openers at a certain rate, which of course included plaintiffs' royalty. This contract was performed for but a fraction of a year, during which time plaintiffs seem to have netted 7½ cents per rod; and, as we understand the record, Motor Products Company usually sold the curtain openers at a price netting plaintiffs 7½ cents per rod royalty until November 1, 1919, when, by reason of infringement and competition, the royalty as between the Motor Products Company and plaintiffs was reduced, generally at least, to 5 cents per rod.

The fact, so far as it was such, that the motor trade generally did not know what royalty was actually paid, or even may not have known what plaintiff's compensation or profits from the sale of the patented device were called, is not important. Clark v. Schieble, supra, at pages 281, 283. While defendant was probably responsible in part for the situation which produced the reduction in royalty, it was not wholly responsible therefor. Naturally, the royalties would vary to some extent according to the number of the cars or openers concerned. The record presented a case calling for the exercise of sound discretion by the master and judge, and we are not prepared to say that such discretion was improvidently exercised in the respect we are considering. The 6-cent rate per rod will accordingly stand.

[7-9] *Time for which interest should run:* This court has held that interest on a royalty award should be allowed "from the date infringement ceased, and until the entry of the final decree." K-W Ignition Co. v. Temco Co., supra, at p. 880; National Tube Co. v. Mark (C. C. A. 6) 10 F.(2d) 430, 433. We have also held that it is at least within the court's discretion to award interest from the time a license should have been purchased as part of the damages for defendant's failure to do so. Munising Co. v. American Co. (C. C. A. 6) 228 F. 700, 708, and cases cited. Especially in view of defendant's 1914 contract for the purchase of the curtain rods, we think a computation of interest with periodical rests would have been within the court's discretion, if the record is sufficient to enable it; but such discretion was not so exercised, and we have difficulty in concluding that the discretion was abused.

[10] *As to interest rate:* We have applied a 6 per cent. rate (Clark v. Schieble, supra), and in Tube Co. v. Mark, supra, we awarded 6 per cent. for a certain period. We have, however, affirmed an award at 5 per cent., which is in Michigan the statutory rate for the use of money (Gear Grinding Co. v. Studebaker Corp. [C. C. A.] 4 F. [2d] 510). As the question of interest rate awardable as damages is, within limitations, matter of discretion, we think the action of the court below in this respect should not be disturbed.

[11] *As to increase of damages:* By a formal finding of fact, the master declared that he was not satisfied "that plaintiffs have sustained the burden of proving, by a fair preponderance of the evidence, their claim that defendant has been guilty of willful infringement." The District Court affirmed the master's report as against specific objections by plaintiffs, to the refusal to increase the damages. This concurrent action should not lightly be set aside. Considering the entire case, we are not prepared to find that the infringement was willful or wanton.

[12] About 95 per cent. of the rods embraced in the accounting were installed in cars already sold. The remaining 5 per cent. consisted of three classes—(1) rods in cars on hand June 4, 1924; (2) on hand on that date, but not yet incorporated in cars; and (3) rods sold to defendant's service stations. In computing damages on the basis of reasonable royalty, we see no sufficient reason why rods in unsold cars or not yet installed in cars should not be accounted for. Had defendant taken a license to manufacture, presumably it would have been required to pay for all manufactured; and had it bought from a lawful source, the result would have been the same.

*As to the third class mentioned:* Had it appeared that the rods were intended for use in replacing worn out parts, they were not includable. Heyer v. Duplicator Co., 263 U. S. 100, 44 S. Ct. 31, 68 L. Ed. 189; Davis Elec. Works v. Edison Elec. Light Co. (C. C. A. 1) 60 F. 276. Cf. Tilghman v. Proctor, 125 U. S. 136, 8 S. Ct. 894, 31 L. Ed. 664. But we do not understand that it so appears here, and we think it a not unnatural presumption that the substantial curtain rods of the patent were not liable to actually wear out.

We see no substantial basis for the contention that plaintiffs have been guilty of such laches in instituting this suit as to defeat right of recovery.

The decree of the District Court is affirmed. Neither party will recover costs of this court.