## GENERAL MOTORS CORPORATION v. BLACKMORE et al.

### No. 5709.

Circuit Court of Appeals, Sixth Circuit.

Nov. 10, 1931.

J. M. Zane, of Chicago, Ill. (Harold W. Norman, of Chicago, Ill., and Stevenson, Butzel, Eaman & Long, of Detroit, Mich., on the brief), for appellant.

J. R. Whiting, of Jackson, Mich. (William H. Aubrey, of Jackson, Mich., and Paul R. Dailey and William M. Swan, both of Detroit, Mich., oh the brief), for appellees.

Before DENISON, HICKS, and HICKENLOOPER, Circuit Judges.

HICKENLOOPER, Circuit Judge.

Appellees recovered a judgment in the District Court in an action at law founded upon Rev. St. § 4919 (title 35, U. S. C. § 67 [35 USCA § 67]), for the infringement of patent to Pearson, No. 855970, on side curtain supports for vehicles (the now familiar curtain rod for automobile touring cars). Fifty-six errors are assigned, but in many instances these may be grouped for consideration, since the main contentions of appellant, defendant below, are presented under a variety of exceptions: To the admission of evidence, to the charge, to refusals to charge, etc. The patent involved was sustained by this court in Collins v. Hupp Motor Car Corporation, 22 F.(2d) 27, 30. The present action was filed December 3, 1926. The patent had expired on June 4, 1924, so that the period of alleged infringement lay between December 3, 1920, and June 4, 1924, a period of three and a half years. Rev. St. § 4921, as amended (title 35, U. S. C., § 70 [35 USCA § 70]). The number of rods used by defendant, which were not purchased from authorized sources, was stipulated to be 1,810,675; and the number of cars so equipped was 486,-093.

The first claim of error to be noticed is that the action could not be maintained at law. Prior to the institution of suit, to wit, on May 15, 1924, Charles C. Blackmore, one of the plaintiffs and owner of the patent in suit, had made a settlement with the defendant whereby he assigned to the defendant "all of the right, title and interest to which the assignor is, or shall or may be entitled in and to any claim or demand which he may or could possess against the Assignee * * * by reason of its or their use of the inventions" covered by the Pearson patent, and released and discharged the assignee "from any and all liability and obligation which it or they may or could be under or liable for, either to him or the said Dayton Top Improvement Company of Dayton, Ohio, by reason of the use or employment by it or them * * * of the inventions mentioned in or covered by said Letters Patent." The question is thus squarely presented whether an exclusive licensee may, by joining the owner of a patent, maintain an action at law under Rev. St. § 4919, after such assignment and release has been given by such patent owner.

By two agreements, dated respectively March 23, 1914, and September 11, 1917, Blackmore had constituted the plaintiff Collins his "exclusive agent" to represent him "in all his dealings with the manufacturers of automobiles." By later agreements of June 7, 1923, and September 6, 1923, this exclusive right of representation was transferred to one Paul R. Dailey, therein designated a "trustee and representative." None of these agreements transferred, or purported to transfer, any title to or interest in the patent itself. In Collins v. Hupp Motor Car Corporation, supra, we held that by the first two agreements above referred to Collins acquired "an irrevocable right for the entire remaining life of the Pearson patent—exclusive as against all the world but Blackmore—to the benefit of the patent in dealing with manufacturers of automobiles." The opinion there expressed is here and now reaffirmed. However, as there indicated, the interest of Collins in the patent was a beneficial or equitable interest, not a legal one. Title remained in Blackmore, although, as is sometimes said, he held that title as trustee for the benefit of himself and Collins.

The situation in respect to legal title was unchanged by the agreements of 1923 which specifically recognized the right of Blackmore "to continue to manufacture and sell the curtain fixtures referred to herein, subject to the provisons of this contract with regard to accounting." It is true that, by the contract of June 7, 1923, it was "agreed that neither party Blackmore nor the party Collins will make any settlement for past infringement nor grant any licenses; it is the understanding that these powers have been conferred on the Trustee," but we construe this provision neither as a conveyance of an interest in the patent nor as an assignment of causes of action already accrued. Dailey was merely substituted as "exclusive agent." It was provided that he should act "in the names of the parties Blackmore and Collins." Thus, while this agreement also gave rise to equitable rights as against all having notice, and to contract rights as between the parties, it left the legal title to the patent and the powers of Blackmore incident thereto, at law, unaffected. Waterman v. Mackenzie, 138 U. S. 252, 255, 11 S. Ct. 334, 34 L. Ed. 923; Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U. S. 24, 37, et seq., 43 S. Ct. 254, 67 L. Ed. 516.

The strict line of demarcation between suits at law and actions in equity has always been preserved by the federal courts. One cannot maintain an action at law against one's self. It follows that an action may not be maintained at law where the person in whose name such action must be brought is himself the infringer (the cause of action being based upon patent), or has assigned his cause of action or given a release to the defendant. This is recognized by those decisions holding that, in any such event, equity will afford relief. Littlefield v. Perry, 21 Wall. 205, 223, 22 L. Ed. 577; Independent Wireless Co. v. Radio Corp., 269 U. S. 459, 472, 473, 46 S. Ct. 166, 70 L. Ed. 357; Wilson v. Chickering, 14 F. 917 (C. C., Mass.). It thus also follows that the case at bar could not be maintained at law—that the court erred in refusing to transfer it to the equity side of the court upon motion of the defendant.

What has already been said also disposes of the contention of the defendant that recovery should be limited to infringement during the period from December 9, 1923, to June 4, 1924. When this action was originally commenced on December 3, 1926, Dailey was not a formal party. It purported to have been brought by Collins and Blackmore. Dailey appeared as "of counsel." By amendment of December 9, 1929, Dailey was added as a party plaintiff, and the agreements of 1923 are cited as the ground for this action. Thereupon the defendant contended that the cause of action had been assigned to Dailey by the 1923 agreements, and that Dailey was therefore a necessary party plaintiff. Thus, it is urged, no valid cause of action was stated in the original declaration and the running of the statute of limitations was not thereby suspended, citing Mellon v. Weiss, 270 U. S. 565, 46 S. Ct. 378, 70 L. Ed. 736, and N. & G. Taylor Company, Inc., v. Anderson, 275 U. S. 431, 48 S. Ct. 144, 72 L. Ed. 354.

The fallacy in defendant's position lies in the contention that the cause of action was assigned to Dailey. As we have said, this is not the case. Dailey was merely made the exclusive agent of both Collins and Blackmore to prosecute suits for infringement in their names. Probably Collins might have brought an action in equity in his own name, since Blackmore had assigned his interest in any recovery to the defendant which had notice of the 1923 agreements; and, while Dailey was a proper party, we do not consider that he was a necessary one. There was no defect in parties plaintiff to the action as originally brought in the names of both Collins and Blackmore. When the assignment and release by Blackmore were pleaded the cause should have been transferred to the equity side, but it would be a continuation of the original cause which the court would then proceed to try in equity. The original filing tolled the running of the statute of limitations, and the contention of defendant is without merit.

It is also insisted that the court erred in not properly submitting to the jury the question of the grant of a license by Blackmore at 5 cents per car. Negotiations for a license had been carried on by both Collins and Blackmore shortly prior to February, 1920, and a license agreement was drawn up and signed by Blackmore. Collins, however, refused to sign, unless a minimum production were stipulated. It was quite clearly understood and intended, we think, that the license should be evidenced by a writing, and that such writing was to have been signed by both Collins and Blackmore. We are therefore unable to accord to the document, which only Blackmore signed, more effect than as an indication of what Blackmore considered a reasonable royalty at that time and in respect of the defendant's production. The submission

to the jury of the question whether an oral license was granted by Blackmore was quite as favorable to defendant as could have been asked, since it appeared, as a matter of law, that no final contract was ever concluded.

Since the cause is to be retried in equity, it is proper that we also express an opinion as to the measure of damages, a question raised in the present record by numerous exceptions to the admission of evidence and to the refusal of the court to charge as requested by defendant. Plaintiffs sought the recovery of a "reasonable royalty" under the doctrine of U. S. Frumentum Co. v. Lauhoff, 216 F. 610 (C. C. A. 6), and Dowagiac Mfg. Co. v. Minnesota Plow Co., 235 U. S. 641, 35 S. Ct. 221, 59 L. Ed. 398. Defendant countered by claiming an "established royalty" and the limitation of plaintiffs' recovery to such established royalty, or to the least amount for which plaintiffs had granted licenses to other automobile manufacturers whose production was comparable to that of defendant. This claim is founded upon the almost exact analogy between an "established royalty" and the market value of the monopoly upon which defendant had trespassed.

■■■■ We accept the position that, where an "established royalty" is clearly shown, that is, a standard rate at which licenses were voluntarily and freely sold, such "established royalty" must control; but this contemplates an absence of peculiar or special circumstances influencing any specific grant and an open, established market unaffected by attending relationships or collateral interests. Conceding that an "established royalty" accurately reflects market value, and is the true equivalent thereof, licenses granted at other times, and between other parties, and upon private negotiations, as distinguished from sales upon an impartial basis, may be extremely helpful in determining the reasonable rate to be applied, but cannot be regarded as conclusive of market value. An exception to the general rate—the preferential treatment of one manufacturer, or even of a number of manufacturers who take out licenses—does not entitle an infringer to precise equality of treatment. The patentee may still recover such sum as would have been reasonable under all the circumstances of the case. And so, too, if there has been a general infringement, and the patent is in wide disrepute and openly defied, these individual and private compacts may even lose much of their probative force as indicating the reasonable royalty. This supposed condition of the market would not affect the amount of an established royalty, if such had been shown, even though it had caused such established royalty to be publicly fixed at a lower rate than would otherwise have been done; but that diminished royalty rate to which the patentee may have been driven in individual cases by the disrepute of his patent and the open defiance of his rights should likewise not be taken as the true measure of a reasonable royalty where no established royalty is shown. The reasonable royalty must still be determined from proofs of acceptance, utility, value, and demand, and upon the hypothesis that the patent was valid and would be respected. Compare Consolidated Rubber Tire Co. v. Diamond Rubber Co. (D. C. So. Dist. N. Y. —Judge Learned Hand), 226 F. 455. This is one of the risks an infringer runs. He may not profit by a general infringement to which his own conduct contributes, unless that situation has been accepted by the patentee as ground for the adoption of a general, fixed, and uniform rate of royalty. Such was not the case here, and the finding of the jury against the existence of an "established royalty" is the only conclusion which is consistent with the evidence.

■■■■ The defendant contends that the court below erred in admitting evidence of various settlements made with other infringers, and of recoveries had in other infringement actions, as proof tending to show what was a reasonable royalty. The settlements might possibly have been offered by defendant as some evidence in the nature of admissions by plaintiffs upon the subject of reasonable royalty, to be given only such weight as might seem reasonable in view of surrounding circumstances; but neither they nor the recoveries in other actions were properly received as evidence in support of plaintiffs' case. Both were res inter alios acta. Both lacked that element of volition upon the part of the infringers which was necessary to show true or actual value by showing what others were generally willing to pay and the licensors willing to accept. Nor was such privity shown between the present defendant and the defendants in the other actions, including the Hupp Case, as would make the decisions in those cases res judicata upon the amount of damage. Upon this issue each case must stand upon its own record.

■■■■ Nor do we think that it was proper to permit evidence of controversies continually arising between Blackmore and Collins to go to the jury. This had no legitimate bearing upon the question of reasonable royalty. It could serve no purpose but to create an un-

wholesome sympathy for Collins in the minds of the jurors.

No prejudice resulted, we think, from the admission in evidence of the contracts of March 23, 1914, and September 11, 1917, between Collins and Blackmore. If these had any evidential force whatever, it was to show the understanding of the contracting parties, as of those dates, that a royalty of 25 cents per car was fair and reasonable in many cases. The same was shown by various early contracts of license which were undisputed, and the evidence was therefore merely cumulative of that which was conceded. We are of the opinion that neither class was too remote in point of time, in view of plaintiff's contention of a general infringement at the later dates, and, as we have said, such general infringement, if it existed, should not affect the amount of the reasonable royalty.

Evidence of profits made upon sales of the patented device was not admissible in the absence of further evidence as to the portion of such profits reasonably to be attributed to the patent, and what portion was fairly ascribed to the production of the rods, as such, as a separate manufacturing enterprise. The plaintiffs claimed no loss of profits, per se— made no showing that they would have sold the devices but for the infringement. The Motor Products Company, which manufactured the devices for Collins, was not a regular licensee, the rods were not sold by it but by Collins, and a mutually agreed basis of settlement between Collins and Blackmore, as a division of profits in lieu of royalty, is not helpful in determining what would be a reasonable royalty where neither Collins nor Blackmore manufactured the rods. The above-mentioned additional elements were not satisfactorily shown.

The nature and scope of the evidence which may legitimately be offered in support of a claim for reasonable royalty are stated in U. S. Frumentum Co. v. Lauhoff, supra; see, also, Clark v. Schieble Toy & Novelty Co., 248 F. 276 (C. C. A. 6), and Dowagiac Mfg. Co. v. Minnesota Plow Co., supra. We see no reason why the royalties paid by Studebaker, 7½ cents per car, to which Collins testifies he did not assent, or 12½ cents per car, upon which basis he agreed to recognize the license in accounting with Blackmore and in the agreement of September 11, 1917; the royalty paid by the Willys-Overland Company of 10 cents per car, which Collins himself negotiated in consideration of the large production; the settlements between Collins and Blackmore for Chevrolet purchases, at 5 cents per car; the correspondence and negotiations with defendant, and between Blackmore and Collins, in reference to a royalty of 5 cents or 10 cents per car, depending upon production; the provision in the agreement of June 7, 1923, apparently fixing 10 cents per car as a reasonable minimum; the license to the Maxwell Motor Corporation at 5 cents per car; and the like, should not be received in evidence as tending to show what was a reasonable royalty in the opinion of the plaintiffs and under the prevailing conditions, to be paid by one having the production of defendant. The fact of a general infringement to which defendant in a very true sense contributed, might qualify and limit the effect to be given to these other contracts at lesser rates, but they should nevertheless be given careful consideration. Quantity of production was unquestionably an important factor; and, when a reasonable royalty as of the time of infringement had once been determined under all the circumstances of the case, including quantity of production, the amount of the royalty so determined would not be affected by the fact that no contract for license was made, that is, by the fact of defendant's infringement.

The amount of the reasonable royalty, however, is a matter primarily for the decision of the trial court. It is only necessary to add that that court, having all parties before it and the trial being in equity, should limit the recovery to the moiety to which Collins is entitled. Blackmore is no longer beneficially interested. The recovery will be for the sole benefit of Collins, and the fact that Dailey, as trustee or exclusive agent, might have had an interest also in Blackmore's share, had the circumstances been different, would not justify increasing the recovery by the amount of such interest, as was done under the proceedings for remittitur in the court below.

The judgment of the District Court is reversed, and the cause is remanded for further proceedings consistent with this opinion.