**GENERAL MOTORS CORPORATION v. DAILEY et al.**

**COLLINS et al. v. GENERAL MOTORS CORPORATION.**

Nos. 7644, 7645.

Circuit Court of Appeals, Sixth Circuit.

Nov. 8, 1937.

royalty for infringement of patent No. 855,970, issued June 4, 1907, to Walter P. Pearson. The Pearson patent, during the period in controversy, was owned by Charles C. Blackmore, who also owned a patent for an accompanying device for vehicle curtain support, No. 985,105, issued to himself. The patented article consisted of supporting rods for automobile curtains fastened to the doors of the old type of open car, so that the curtains would swing with the doors. The Pearson patent was held valid in this court in the case of Collins v. Hupp Motor Car Corporation, 22 F.(2d) 27.

This action was begun at law by Jeffrey N. Collins, whom Blackmore had constituted his exclusive agent to represent him in all dealings with manufacturers of automobiles. Collins joined Blackmore as a plaintiff, alleging that Blackmore had refused to sue.[1] Blackmore, prior to the filing of the petition herein, assigned his entire right, title and interest in any claim or demand which he might have against the assignee growing out of its use of the Pearson patent to General Motors Corporation, and released and discharged the assignee from all liability growing out of its use of the invention. In the first trial a motion was made to transfer the case to the equity side of the court, which motion was denied. On appeal this court held [General Motors Corporation v. Blackmore, 53 F.(2d) 725] that the motion should have been sustained because an action could not be maintained at law in which Blackmore was joined as plaintiff after having executed the assignment and release to General Motors Corporation. The cause was remanded for equity trial, and for determination of reasonable royalty. On the retrial the court found royalty of fifteen cents per car to be reasonable, and allowed interest on the award from the date of the expiration of the patent.

The principal contentions of appellant are that the rate of royalty is too high, and that the date from which interest runs on the award should be the date of the decree rather than the date of expiration of the patent. The cross-appeal assigns as error the failure of the court to allow damages for wilful infringement.

Harold W. Norman, of Chicago, Ill. (John M. Zane, of Chicago, Ill., on the brief), for General Motors.

Benjamin Kleinstiver, of Jackson, Mich. (Justin R. Whiting, of New York City, William H. Aubrey, of Jackson, Mich., and Ralph E. Routier, of Detroit, Mich., on the brief), for Dailey et al.

Before HICKS and ALLEN, Circuit Judges, and HAMILTON, District Judge.

ALLEN, Circuit Judge.

Appeal and cross-appeal from decree awarding damages by way of reasonable

---

[1] Paul R. Dailey was later added as a party plaintiff, and the petition was amended to aver that Collins and Blackmore had appointed Dailey their trustee to bring actions for infringement. Dailey is now deceased, and Viola B. Dailey, his administratrix, has been substituted.

### The Rate of Reasonable Royalty

The infringement of the patent is not questioned. The number of cars on which the devices were used by General Motors Corporation as original equipment was 486,093. 55,265 infringing curtain rods were used by General Motors Corporation for service during the same period. The trial court determined that in view of the wide range of royalties paid for the device, and taking into consideration the element of quantity of production, the reasonable royalty was 15 cents per car, and 3¾ cents per rod for the structures used in service. Appellant contends that this rate is too high because of its great quantity production and because a lower license rate than 15 cents was given to certain licensees. Appellee, while not assigning error to the rate of royalty, contends that the reasonable rate of royalty for the device, in the absence of disturbing price factors such as the general infringement alleged to have existed, was 25 cents per car.

No established royalty is shown. In their original written contract Collins and Blackmore agreed to demand not less than 20 cents per car for license to manufacture. Blackmore manufactured the rods and sold them direct to automobile manufacturers. Collins was to introduce the rods and put them on the market. It soon developed that Blackmore could not manufacture rods in a sufficient quantity to meet the demand, and Collins arranged with Diamond Manufacturing Company, the predecessor of Motor Products Corporation, to supply the rods. Collins made an alternative proposition to automobile manufacturers, offering them either a license at the rate of 25 cents per car, or that they buy the rods from Motor Products Corporation. This company manufactured the rods, sold and delivered them, and from the prices which it received it paid Collins 25 cents per roadster and 30 cents per touring car. Collins then remitted one-half of this amount to Blackmore. During the years 1915 to 1923 inclusive, Motor Products Corporation sold the device to more than 50 automobile manufacturers, and to 63 automobile top, body and trim companies.

The rates of 25 cents and 30 cents were paid by Motor Products Corporation to Collins on all sets until November, 1919, after which time it lowered its rate to 20 cents per car, or five cents per rod. Infringement was then beginning to be general.[2] These rates were paid to Collins irrespective of the prices charged by Motor Products Corporation.

On the former appeal [53 F.(2d) 725, 730] it was declared that these sales were made by Collins and not by Motor Products Corporation, and that the amounts of 25 cents and 30 cents respectively were not royalties, but profits. The court stated that evidence of profits made upon sales of the patented device was not admissible in absence of further evidence as to the portion of such profits reasonably to be attributed to the patent and the portion fairly to be ascribed to the production of the rods as a separate manufacturing enterprise. Appellee contends that in the retrial additional evidence was introduced which supports a finding that the payments by Motor Products Corporation were reasonably attributable to the Pearson patent, and constituted royalty.

We think this record supports appellee's contention. The new testimony introduced herein shows that the sales were made not by Collins, but by Motor Products Corporation. There was no partnership between Collins, Blackmore and Motor Products Corporation, and no agency relationship existed between the corporation and Blackmore. The entire operation of manufacture and sale was carried on by Motor Products Corporation. Collins' arrangement was merely to introduce the rods to the trade, not to make the sale. He never made a second call on the automobile manufacturer unless some engineering difficulty arose. Motor Products Corporation determined whether credit should be extended, made and delivered the rods, sent out the invoices, and then accounted for royalties to Collins, who divided the sums received with Blackmore upon an equal basis, the total amount received being $148,767.06. Tags provided by Collins were applied to the rods to indicate the patent number.[3]

[2] "As we understand the record, Motor Products Company usually sold the curtain openers at a price netting plaintiffs 7½ cents per rod royalty until November 1, 1919, when, by reason of infringement and competition, the royalty as between the Motor Products Company and plaintiffs was reduced, generally at least, to 5 cents per rod." Collins v. Hupp Motor Car Corporation (C.C.A.) 22 F.(2d) 27, 31.

[3] It is true that both the Pearson and the Blackmore patent numbers were written on these tags, and also the two num-

■ Also Motor Products Corporation was licensed to perform this operation. On inquiry from Diamond Manufacturing Company, the predecessor of Motor Products Corporation, which had received an order for rods from the Hupp Motor Car Corporation, and knew the rods were patented, written authority was given by Blackmore to manufacture the curtain carriers on any and all orders turned over by Collins. At about the same time Collins and the manager of Diamond Manufacturing Company agreed verbally that the company should make the rods for Collins and sell them at a price including a royalty of 25 cents on a roadster and 30 cents on a touring car. Not only were rods sold on orders from Collins, but over the period of several years, with the acquiescence of Collins and Blackmore, rods were manufactured and sold by Motor Products Corporation on repeat orders which did not come from Collins. Thus Motor Products Corporation was a licensee of Blackmore.[4]

As to the nature of the payments it is significant that substantially the same amount as the license royalty demanded was regularly turned over to Collins by Motor Products Corporation. It is a fair inference that the manufacturers who bought the rods from Motor Products Corporation, after having been presented the alternative proposition of a license at 25 cents royalty or of purchase from a company licensed to manufacture, knew that a sum similar to the royalty rate was included in the price which they paid such ·company. Motor Products Corporation paid these amounts for the right to make and sell the patented article, and hence the payment has the essential characteristic of royalty.

■ Apart from the regular payments made by Motor Products Corporation to Collins, the record supports the finding of the District Court that 15 cents is a reasonable rate per car. Licenses unquestionably issued at less than 15 cents royalty. Blackmore gave a sliding-scale license to Studebaker which, because of the quantity

of its production, resulted in a payment of 12½ cents per car. This license was given without Collins' knowledge, but he himself did suggest a 15-cent license to Studebaker. The Dodge Company made an advance payment of $17,500 cash in part settlement for infringement and for royalties. As Dodge used the device on over 480,000 cars, this rate turned out to be very low per car. Since it was an advance payment, however, in which both parties speculated on the possible number which would be used, this rate is not conclusive. Collins himself gave the license to Willys-Overland at 10 cents per car, and corresponded with General Motors Corporation as to a royalty of 5 cents to 10 cents per car, depending upon production. This negotiation did not result in a contract because General Motors refused to guarantee a minimum production. Later General Motors claimed the patent was invalid. After the period of infringement, which began in 1917, Collins and Blackmore authorized Dailey, the trustee, to settle infringement claims at a minimum rate of 10 cents per car.

However, this is not the whole picture. Cadillac took a license in September, 1914, at 25 cents per car and retained it until September, 1919. Three other divisions of General Motors for several years paid Motor Products Corporation sums for rods which included 30 cents per car (Buick and Oldsmobile) and 20 cents per car (Oakland). In an accounting suit brought by Collins against Blackmore, it was disclosed that Blackmore had sold rods to numerous companies without the knowledge of Collins, and under judicial decree he accounted to Collins for royalties of 25 cents per car paid by 14 companies, 20 cents per car paid by seven companies, 15 cents per car paid by one company, and five cents per car paid by two companies. This account covered the period of September, 1919, to November, 1921.

■■ Bearing in mind the previous holding of this court that the diminished royalty

bers were referred to in several written license agreements, but the Pearson patent was the controlling factor. The essential feature of the Blackmore patent was a clamp to support the curtain rod, while the Pearson device was the curtain rod itself.

[4] "Any language used by the owner of the patent or any conduct on his part ex-

hibited to another, from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license, and a defense to an action for a tort." De Forest Radio Telephone Co. v. United States, 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625.

942

rate to which the patentee may have been driven in individual cases by the disrepute of his patent and the open defiance of his rights should not be taken as the true measure of reasonable royalty where no established royalty is shown, and the fact clearly proved that a number of companies infringed from 1917 on, including several divisions of General Motors Corporation, we think that the determination of the District Court complied with the rule [53 F.(2d) 725] that reasonable royalty must be determined from proofs of acceptance, utility, value, and demand, and upon the hypothesis that the patent was valid and would be respected. The patent was accepted generally by leading automobile manufacturers. Its utility was judicially determined in Collins v. Hupp Motor Car Corporation, supra.[5] Its value was shown by its wide use and the demand for it which existed. To draw the proper conclusion from these conflicting facts called for the exercise of judicial discretion by the District Court, and we cannot say that such discretion was not properly exercised. Upon the question of royalty rate the decree must be affirmed.

### Interest

 The patent expired June 4, 1924, and interest was allowed from that date. Suit was not commenced until December 3, 1926. The major delays which followed in the trial of the case are not due to the action of appellant. In Duplate Corporation v. Triplex Safety Glass Co., 298 U.S. 448, 459, 56 S.Ct. 792, 797, 80 L.Ed. 1274, the Supreme Court stated with reference to interest upon an award of reasonable royalty that "interest should run from the date when the damages are liquidated, and not, as by the present decree, from the date of the last infringement." The court pointed out that there were no exceptional circumstances justifying a departure from this rule. No such exceptional circumstances are shown in this record. In this respect the decree must be modified.

### Increased Damages

 An increase of damages is prayed for in the cross-appeal, under 35 U.S. C.A. § 70. Appellee claims that appellant is guilty of conscious, deliberate patent infringement, and protracted, vexatious and expensive litigation. Cf. Overman Cushion Tire Co., Inc., v. Goodyear Tire & Rubber Co., Inc., 66 F.(2d) 361 (C.C.A.2). The allowance of such an increase is entirely within the discretion of the court. Vortex Mfg. Co. v. Ply-Rite Contracting Co., 33 F.(2d) 302 (D.C.). We think that the court did not abuse its discretion in failing to grant the increase. Simply questioning the validity of the patent does not constitute wilful infringement. Brown Bag-Filling Machine Co. v. Drohen, 175 F. 576 (C.C.A.2); Toledo Computing Scale Co. v. Moneyweight Scale Co. (C.C.) 178 F. 557, affirmed 187 F. 826 (C.C. A.7). The protracted delay in the litigation is chargeable to appellee, who did not bring suit until more than two years after the expiration of the patent and sued at law when it should have filed a bill in equity.

The decree is amended to allow interest on the award from May 28, 1936, and as amended, it is affirmed. The cross-appeal is dismissed.

---

[5] "It appears by testimony of competent witnesses that the invention of this patent was revolutionary. The device of the patent is highly useful and meritorious. It has been adopted by practically all the automobile manufacturers in this country except Ford. In addition to its merit as a mere curtain carrier, it is adaptable to ready dis-assembling when curtains are not needed." Collins v. Hupp Motor Car Corporation (C.C.A.) 22 F.(2d) 27, 28.